# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

ROBERT ADAMS, III,

                                        Plaintiff,

                                                                 9:16-CV-527
              v.                                                 (GTS/ATB)

DAVID O'HARA, et al.,

                                        Defendants.

---

ROBERT ADAMS, III, Plaintiff, pro se
NICOLE E. HAIMSON, Asst. Attorney General for Defendants

ANDREW T. BAXTER
United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable Glenn T. Suddaby, Chief United States District Judge.  Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 132).  Plaintiff responded in opposition to the motion, and defendants filed a reply. (Dkt. Nos. 138-141, 146, 150).  For the reasons set forth below, this court will recommend granting defendants' summary judgment motion only with respect to defendants Smith, Cornell, Lamanna, Robinson, and Venettozzi, and dismissing those specific defendants from this proceeding.  As also explained below, this court further recommends that defendants' summary judgment motion be denied with respect to all claims against defendants O'Hara, Kirkwood, Curtis, Seery, Dilallo, and Walshvelo.

## I.  **Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material

fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

## II.    **Relevant Facts and Contentions**

Plaintiff is an inmate under the jurisdiction of the New York State Department of Corrections and Community Supervision ("DOCCS"), who was housed at the Auburn

Correctional Facility ("Auburn") from approximately April 2014 until his transfer to Southport Correctional Facility ("Southport") on or about March 5, 2015. (Dkt. No. 132-8, Haimson Decl., Ex. A., Deposition Transcript ("Dep.") at 17; Dkt. No. 132-9, Haimson Decl., Ex. B, Inmate Internal Movement History.). On the evening of January 18, 2015, plaintiff was attending religious services at the Auburn chapel. (Dkt. No. 89, Second Amended Complaint ("Sec. Am. Compl.") ¶ 21). During the service, defendant Kirkwood, an Auburn correctional officer, ordered plaintiff to leave the service and meet him in the foyer or entranceway of the chapel. (*Id*. ¶ 23). Plaintiff contends that, when he reached the foyer, defendant Kirkwood and defendant O'Hara, another Auburn correctional officer, began to verbally harass him. (*Id*. ¶ 24). Defendant O'Hara then ordered plaintiff to place his hands against the wall, and conducted an "aggressive" frisk while making crude sexual and racial comments. (*Id*. ¶¶ 25-28, 30-34).

Plaintiff contends that defendant O'Hara repeatedly poked him in the back of his head and neck, while saying, "You scared little bitch, come off the wall, or I'm going to beat your ass." (*Id*. ¶ 37). Plaintiff remained on the wall. (*Id*. ¶ 39). As set forth in the Second Amended Complaint, defendant O'Hara then "grabbed the plaintiff by the back of his neck and arm, and threw him to the floor." (*Id*.) At some point during this altercation, an alarm was sounded, and defendants Curtis, Seery, Dilallo, and Walshvelo arrived in response. (Dep. at 77). In his Second Amended Complaint and his deposition testimony, plaintiff described a lengthy assault during which defendants Kirkwood, O'Hara, and Curtis repeatedly punched, kicked, and stomped on him. (Sec. Am. Compl. ¶¶ 41-56; Dep. at 57-76).

3

Plaintiff alleges that when this initial assault ended, defendant Seery "tightly handcuffed" plaintiff, in such a way that the metal dug into plaintiff's wrists, "causing excruciating pain, abrasions, bleeding, numbness, and loss of feeling in [plaintiff's] hands." (Sec. Am. Compl. ¶ 57). Plaintiff's requested three times that the handcuffs be loosened, but defendant Seery ignored him. (*Id*. ¶ 58). Instead, defendant Seery used the handcuffs to "snatch" plaintiff up from the floor, and then pushed him into a corner. (*Id*. ¶¶ 59-61). Plaintiff then alleges that defendant Seery stood behind plaintiff, and used his "state issued baton" to choke him for "at least twenty seconds." (*Id*. ¶ 66). Plaintiff contends that defendants Dilallo and Walshvelo were within a few feet of defendant Seery, but did nothing to protect plaintiff. (*Id*. ¶¶ 67-70).

Plaintiff further alleges that while he was standing in the corner, he could overhear defendant O'Hara saying "hit me" to defendant Kirkwood, and witnessed defendant Kirkwood punch defendant O'Hara on the right side of his face. (Sec. Am. Compl. ¶¶ 74-75). This punch left a small cut over defendant O'Hara's right eye. (*Id*. ¶ 76). Defendant O'Hara then approached plaintiff, pointed at the cut on his own face, and told plaintiff, "You did this." *(Id*. ¶ 77).

As described in his Second Amended Complaint, plaintiff claims that he was subjected to more excessive force before being escorted to the Auburn Special Housing Unit ("SHU"). He claims that defendant Dilallo approached plaintiff and punched him in the abdomen, causing plaintiff to "cough up blood" onto the chapel wall. (Sec. Am. Compl. ¶ 81).

Defendants Seery, Dilallo, and Walshvelo ignored plaintiff's request to be taken

4

to the infirmary immediately. (Sec. Am. Compl. ¶ 93).  Instead, plaintiff was evaluated after his arrival at SHU by defendant Lattimore-Smith, a resident nurse at Auburn. (*Id.*; Dkt. No. 132-20, "Lattimore-Smith Decl." ¶ 8).  Plaintiff complained of severe pain, a swollen left eye, lacerations on the inside of his mouth, chipped teeth, and cuts on his wrists and hands. (Sec. Am. Compl. ¶¶ 95-96).  Plaintiff also reported that he had a severe headache, dizziness, and a sore throat from being choked by defendant Seery. (*Id.* ¶ 96-97).

Plaintiff contends that defendant Lattimore-Smith ignored his request to include the cause of his injuries in the medical report.  (*Id.* ¶ 98).  He also contends that defendant Lattimore-Smith ignored his request for specific treatment, including an ice pack for his face, disinfectant for his cuts, and tylenol. (*Id.* ¶¶ 107-108). Plaintiff also expressed concerns that he had a broken rib, and requested a referral for an x-ray. (*Id.* ¶ 113).  Defendant Lattimore-Smith refused this request. (*Id.* ¶ 114).

While housed in SHU, plaintiff requested medical treatment for his injuries during sick call. (Sec. Am. Compl. ¶ 129).  He contends that defendant Lattimore-Smith intervened and discouraged the medical staff from assisting plaintiff because his condition was "fine." (*Id.* ¶ 136).  Plaintiff contends that this lack of treatment contributed to the severe pain and discomfort that he experienced from his injuries over the next several weeks. (*Id.* ¶ 139).

On January 19, 2015, plaintiff was served with three misbehavior reports arising from the previous day's incident. (Sec. Am. Compl. ¶ 179; Dkt. No. 132-11, "Lamanna Decl. Ex. A." at 7-9).  In the first, defendant O'Hara charged that plaintiff came off the

wall during a pat-frisk and struck O'Hara in the head with a closed fist. (Sec. Am. Compl. ¶ 181; Lamanna Decl. Ex. A, at 8).  In the second misbehavior report, defendant Kirkwood charged that plaintiff elbowed him in the chest and spat at him. (Sec. Am. Compl. ¶ 184; Lamanna Decl. Ex. A, at 9).  Another correctional officer, defendant Cornell, searched plaintiff's cell after the incident, and issued a misbehavior report charging that plaintiff had taped a sharpened piece of a metal can top that could be used as weapon to the underside of his bed. (Sec. Am. Compl. ¶ 185; Lamanna Decl. Ex. A,, at 7).

Plaintiff's disciplinary hearing related to the three misbehavior reports commenced on January 23, 2015, with defendant Lamanna acting as hearing officer. (Sec. Am. Compl. ¶ 191).  After hearing testimony from plaintiff, defendant O'Hara, defendant Kirkwood, and another inmate, defendant Lamanna found plaintiff guilty of violating DOCCS rules prohibiting violent conduct, assault on staff, refusal of a direct order, interference with search procedures, and an unhygienic act (spitting).  (Lamanna Decl. Ex. A, at 1-7).  Defendant Lamanna also found plaintiff guilty of violating DOCCS rules regarding weapons. (*Id*. at 5).  He sentenced plaintiff to 700 days in SHU, 700 days loss of package privileges, 700 days loss of commissary and phone privileges, and a recommended loss of 365 days good time. (Dkt. No. 132-10, "Lamanna Decl." ¶ 55).

DOCCS policy requires that the facility superintendent review all disciplinary sentences that include SHU or keeplock time of nine months or more. (Dkt. No. 132-16, ("Robinson Decl." ¶ 10).  Accordingly, defendant Robinson, in his role as acting

superintendent, reviewed plaintiff's sentence on February 12, 2015. (Robinson Decl. ¶ 15). Relying on DOCCS guidelines, defendant Robinson concluded that plaintiff's sentence was not excessive in light of the charges against him and plaintiff's disciplinary history. (Robinson Decl. ¶ 22-23).

On February 27, 2015, plaintiff appealed his disciplinary determination. (Sec. Am. Compl. ¶ 242). In that appeal, he denied the charges against him and complained that he had actually been assaulted during the incident. (*Id*. ¶ 242-43). He also alleged numerous procedural defects in the hearing. (*Id*. ¶ 245). On May 1, 2015, defendant Venettozzi, in his role as DOCCS Director of Special Housing/Inmate Discipline, upheld the charges against plaintiff but modified the penalties to 365 days of SHU confinement, 500 days loss of packages, commissary, and phone privileges, and 12 months recommended loss of good time. (Dkt. No. 132-14, "Venettozzi Decl." ¶ 14).

In his Second Amended Complaint, plaintiff has brought excessive force claims against defendants O'Hara, Kirkwood, Curtis, Seery, and Dilallo; failure to protect claims against defendants Dilallo and Walshvelo; a medical indifference claim against defendant Lattimore-Smith; a retaliation claim against defendant Cornell; and due process claims against defendants Lamanna, Robinson, and Venettozzi. All defendants have moved for summary judgment, on the grounds set out below.

## III.  **Exhaustion of Administrative Remedies**

### A.  **Legal Standards**

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil

rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse

decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC").  *Id*. § 701.5(d).  The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance."  *Id*. § 701.3(a) (Inmate's Responsibility).  There is also a special section for complaints of harassment.  *Id*. § 701.8.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies.  *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004).  The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement.  *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances."  *Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1857 (June 6, 2016).  "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'"  *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. Sept. 1, 2016) (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1857).  Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid.

9

The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, __ U.S. at __, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 656 F. App'x at 580. An administrative procedure is "unavailable" when

> (1) "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Ross*, __ U.S. at __, 136 S. Ct. at 1859-60.

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Id.* The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

## B.    Application

Defendants argue that plaintiff never brought any grievances complaining about excessive force, failure to protect, medical indifference, or retaliation arising from the

January 18, 2015 incident. (Dkt. No. 132-6, "Parmiter Decl." ¶ 10). In support of this contention, defendants have filed the declaration of Cheryl Parmiter, the Inmate Grievance Program ("IGP") Supervisor at Auburn. In that role, Ms. Parmiter maintains the grievance records at Auburn. (*Id*. ¶ 2). Ms. Parmiter states that, based upon her review of Auburn records, plaintiff did not file any grievances while housed there in 2015. (*Id*. ¶ 11).

Defendants have also filed the declaration of Rachael Seguin, the Assistant Director of the IGP for DOCCS. (Dkt. No. 132-4, "Seguin Decl.")). Ms. Seguin serves as the records custodian for the Central Office Review Committee ("CORC"), which renders the final administrative decisions under the IGP. (*Id*. ¶ 3). Ms. Seguin states that Auburn had a "fully functioning inmate grievance process available" while plaintiff was incarcerated at the facility. (*Id*. ¶ 12). Ms. Seguin also states that she examined CORC records for "determinations upon grievance appeals brought by [plaintiff]." (*Id*. ¶ 10). A copy of the computer print-out listing this information is attached as Exhibit A to the Seguin Declaration. (Dkt. No. 132-5). The records show that plaintiff filed one grievance appeal to the CORC in 2015. (*Id*.) This grievance appeal, titled "Disciplinary Sanctions Incorrect," was not filed until August 31, 2015. (*Id*.) According to Seguin, this grievance did not "concern any January 18, 2015 excessive force by defendants O'Hara, Kirkwood, Curtis, Seery, and Dilallo; failure to protect by defendants Dilallo and Walshvelo; medical indifference by defendant Lattimore-Smith; or retaliation by defendant Cornell." (*Id*. ¶ 14).

Based on those records, defendants contend that plaintiff's excessive force,

failure to protect, medical indifference, and retaliation claims should be dismissed for failure to exhaust administrative remedies. (Dkt. No. 132-2, "Def. Br." at 5-9). However, plaintiff alleges that he wrote a grievance dated January 20, 2015 which detailed the assault of January 18, 2015 and the subsequent denial of medical care, and refuted the weapons charge against him. (Sec. Am. Compl. ¶ 142). He further alleges that an unidentified sergeant came to plaintiff's cell on the SHU block on January 22, 2015, holding one or more pages of that grievance. (*Id*. ¶ 143). This sergeant, who is not a defendant in this litigation, allegedly asked plaintiff if he had written the grievance. (*Id*.) When plaintiff confirmed that he had, the sergeant "ripped [plaintiff's] grievance down the middle," and told plaintiff that "you don't assault my officers, and then cry about the aftermath." (*Id*. ¶ 144). This sergeant warned plaintiff that "unless [you're] looking for a repeat of what happened the other night, I suggest that you leave this alone." (*Id*.)

The Second Circuit has recently evaluated the DOCCS grievance process and concluded that if a grievance is lost or destroyed before it is received by the IGRC and assigned a number, it becomes difficult for an inmate to "appeal" a grievance "to the next step." *See Williams v. Priatno*, 829 F.3d 118, 124 (2d Cir. 2016) ("On their face, the regulations only contemplate appeals of grievances that were actually filed. . . . Accordingly, the regulations give no guidance whatsoever to an inmate whose grievance was never filed.)

As discussed above, under *Ross*, the only relevant judicial inquiry with regard to exhaustion is whether the administrative remedies were "available" to the inmate. 136

S. Ct. at 1859-60. If prison administrators "thwart" inmates from taking advantage of the grievance process through "machination, misrepresentation, or intimidation," the administrative remedies are "unavailable," and the inmate is excused from the exhaustion requirement, regardless of which "official" prevented plaintiff from filing the grievance. *Id.* at 1860. Consistent with this approach, district courts in this circuit have concluded that where an inmate plausibly alleges that his failure to file a grievance was due to threats of physical harm by facility staff, there exists a material question of fact as to whether the defendant officers may rely upon the inmate's non-exhaustion as an affirmative defense. *Mandell v. Goord*, No. 9:06-CV-1478 (GTS/DEP), 2009 WL 3123029, at *9 (N.D.N.Y. Sept. 29, 2009); *Morrison v. Hartman*, No. 07-CV-6633L, 2010 WL 811319, *3 (W.D.N.Y. Mar. 3, 2010); *Lunney v. Brureton*, No. 04 CIV 2438, 2007 WL 1544629, at *9 (S.D.N.Y. May 29, 2007) (collecting cases).

Specific threats of retaliation may reasonably deter an inmate from filing a grievance, particularly when the threats follow an assault. *See, e.g., Hemphill*, 380 F.3d at 688 (remanding for determination of availability of administrative remedies where officer threatened to retaliate against the plaintiff if he filed a complaint). Here, plaintiff has plausibly alleged that an Auburn official directly thwarted his timely attempt to file a grievance, and threatened physical harm if plaintiff sought administrative relief. Although plaintiff has not identified the sergeant who allegedly made that threat, his version of events has been consistent throughout his second amended complaint, his deposition testimony, and his response to this pleading. (Sec.

13

Am. Compl. ¶ 254; Dep. at 124-130; Dkt. No. 138-1, "Pl.'s Decl." ¶ 24).  Plaintiff also alleges that he attempted to file a grievance related to the January 18, 2015 incident after he was transferred to Southport in March 2015, but that this attempt was rejected as untimely.  In his response to defendants' summary judgment motion, plaintiff has included correspondence from the Southport IGP supervisor that references an untimely grievance "concerning an incident on 1/26/15" that occurred at Auburn. (Dkt. No. 138-5, at 39).  Plaintiff contends that the date in the letter is a typographical error, and that the grievance addressed the January 18, 2015 incident. (Pl.'s Decl. ¶ 50-51).  Plaintiff's apparent attempt to file an untimely grievance once he was transferred from Auburn to Southport is consistent with his alleged concerns about retribution or retaliation. *Mandell*, 2009 WL 3123029, at *10 (fact that plaintiff waited until he was transferred from facility to file a grievance corroborated his alleged fear of retaliation).  Plaintiff has thus alleged more than a "generalized fear of retaliation" that raises a sufficient question of material fact as to whether administrative remedies were available to him. This question of fact is sufficient to overcome defendants' motion for summary judgment on exhaustion grounds.

This court notes that plaintiff wrote to his family regarding the alleged assault, and filed a complaint with the New York State Office of the Inspector General while he was housed in Auburn, despite the alleged threats by the unidentified sergeant.  (Sec. Am. Compl. ¶ 146).  This does not change the availability analysis.  "[T]hreats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions

of greater authority within the prison system, or to external structures of authority . . . ."
*Hemphill*, 380 F.3d at 689.  Therefore, plaintiff's attempts to circumvent the ordinary grievance process do not necessarily contradict his claims that he feared that Auburn officials would follow through on threats to harm him.

In light of *Ross* and the cases in this Circuit that have applied it, this court cannot find that defendant has established on the existing record, that there is no material question of fact with respect to the exhaustion of plaintiff's remedies, and I recommend denying defendants' motion for summary judgment on exhaustion grounds.

## IV.    Heck v. Humphrey (O'Hara, Kirkwood, Curtis, Seery, Dilallo, and Walshvelo)

### A.    Legal Standards

In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court held that a section 1983 action seeking damages is not cognizable if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction, unless the conviction or sentence had been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or called into question by a federal habeas court. 512 U.S. at 486-87.  This is referred to as the "favorable termination rule."  In *Edwards v. Balisok*, 520 U.S. 641 (1997), the Supreme Court extended the rationale in *Heck* to section 1983 challenges to prison disciplinary proceedings in which a decision in plaintiff's favor would necessarily reverse the administrative decision revoking a plaintiff's good time credits, thereby affecting the length of the plaintiff's confinement. 520 U.S. at 644.

In *Peralta v. Vasquez*, the Second Circuit held that *Heck's* "favorable

termination" rule was not an absolute bar to a prisoner who was subject to "mixed sanctions" as the result of a disciplinary hearing.  *Id*., 467 F.3d 98 104 (2d Cir. 2006). "Mixed sanctions" are defined as "sanctions that affect both (a) the duration of [plaintiff's] imprisonment and (b) the conditions of his confinement." *Id.*  The loss of good time affects the duration of plaintiff's confinement, while the SHU sentence only affects the conditions of plaintiff's confinement.  The Second Circuit held in *Peralta*, that an inmate subject to mixed sanctions could proceed separately under section 1983 with a challenge to the sanctions which affect the conditions of his confinement only if he was willing to "forgo once and for all any challenge to any sanctions that affect the duration of his confinement." *Id.*  This has become known as a *Peralta* Waiver.

### B.    Application

Plaintiff filed an executed *Peralta* Waiver on July 8, 2016, so that he could pursue his due process claim against defendants Lamanna, Venettozzi, and Robinson. (Dkt. No. 10).  Judge Suddaby accepted plaintiff's Peralta Waiver in a July 15, 2016 decision and order, in which he dismissed plaintiff's claims to the extent that they challenged disciplinary sanctions affecting the duration of his confinement. (Dkt. No. 12).

Plaintiff's Peralta Waiver does not affect his excessive force claim.  However, in raising his excessive force claim, plaintiff has consistently asserted that the use of force against him on January 18, 2015 was unprovoked, that he did not assault defendant O'Hara or defendant Kirkwood, and that the outcome of his disciplinary hearing was factually incorrect.  Thus, relying on *Heck* and *Edwards*, defendants contend that

plaintiff's excessive force claim is barred because it "necessarily implies" the invalidity of the disciplinary hearing at which plaintiff was found guilty of assaulting a correctional officer, and the resulting loss of good time. (Dkt. No. 150, Def.'s Reply Br. at 7). This court disagrees.

The key inquiry in an excessive force case is whether defendants utilized force against plaintiff in a good faith effort to maintain or restore discipline, or instead applied force maliciously and sadistically for the very purpose of causing harm. *See Wynter v. Ramey*, No. 9:11-CV-257 (DNH/DEP), 2013 WL 5465343, at *5 (N.D.N.Y. Sept. 4, 2013) (citing *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)). At plaintiff's disciplinary hearing, defendant Lamanna found that plaintiff had punched defendant O'Hara and elbowed defendant Kirkwood. That finding, however, is not necessarily incompatible with a finding that defendants O'Hara, Kirkwood, Curtis, and Seery responded with excessive force. Based on that premise, courts have found that a conviction for assault would not necessarily preclude an excessive force claim against the responding officers, because the fact that plaintiff assaulted an officer does not preclude a reasonable jury finding that the force used during the incident, or after the incident, was excessive under the circumstances. *See Shapard v. Attea*, 710 F. App'x 15, 17-18 (2d Cir. 2017); *see also Jeanty v. County of Orange*, 379 F. Supp. 2d 533, 542-43 (S.D.N.Y. 2005) (citing *Sales v. Barizone*, No. 03 Civ. 6691, 2004 WL 2781752, at *13-14 (S.D.N.Y. Dec. 2, 2004)). *See also Brooks v. Brennan*, No. 9:12-CV-624, 2014 WL 697530, at *6-8 (N.D.N.Y. Dec. 9, 2014) (adopting Rep't-Rec.) (neither collateral estoppel, nor *Heck* barred inmates excessive force claim,

notwithstanding his conviction for assault).

Defendants attempt to distinguish this line of cases by arguing that plaintiff's repeated denials that he assaulted any correctional officer and his insistence that the defendants' use of force was unprovoked necessarily imply the invalidity of findings in the disciplinary hearing. (Def. Br. at 9-13). This concern does not merit summary judgment in favor of defendants. Instead, the issue can be addressed by the court if the matter goes to trial, by limiting plaintiff's testimony and giving appropriate jury instructions. *See Shapard*, 710 F. App'x at 18 ("On remand, the district court may take appropriate steps to prevent [plaintiff] from disputing the assault, including limiting his testimony and instructing a jury that he assaulted Officer Attea"); *see also Gilbert v. Cook*, 512 F.3d 899, 902 (7th Cir. 2008) ("It would have sufficed to tell the jurors that [plaintiff] struck the first blow . . . that any statements to the contrary by [plaintiff] or a witness must be ignored, and that what the jurors needed to determine was whether the guards used more force than was reasonably necessary to protect themselves from an unruly prisoner.").

Accordingly, even if plaintiff had punched defendant O'Hara or elbowed defendant Kirkwood, the defendants could have conceivably used excessive force in responding to the incident. Thus, plaintiff's excessive force claims, and the related failure to protect claims, would not be barred by *Heck*, and this court recommends denial of the summary judgment motion as to plaintiff's claims against defendants O'Hara, Kirkwood, Curtis, Seery, Dilallo, and Walshvelo.

18

**V.    Medical Indifference (Lattimore-Smith)**

**A.    Legal Standards**

In order to state a claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

**1.    Objective Element**

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmate's health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer*, 511 U.S. at 844–47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the

19

plaintiff. *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 32–33 (1993)). If the "unreasonable care" consists of a failure to provide ***any*** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003)). However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the issue is an unreasonable delay or interruption of ongoing treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith*, 316 F.3d at 185). The court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for a constitutional claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

### 2.    Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 300 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer*, 511 U.S. at 835–37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer*, 511 U.S. at 839–40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing

*Chance*, 143 F.3d at 702).  The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference.  *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent."  *Farmer*, 511 U.S. at 844.  The court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable."  *Salahuddin* 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim.  *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001).  Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates.  *Id.* (citations omitted).  An inmate does not have the right to treatment of his choice.  *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986).  Because plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation.  *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment.  *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle v. Gamble*, 429 U.S. at 107).  Even if those medical judgments amount to negligence or

malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id.; see also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (noting that negligence is not actionable under § 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under § 1983.

### B.    Application

Defendant argues that plaintiff has failed to allege that he has a serious medical need, and in the alternative, that plaintiff has failed to properly state a claim that defendant Lattimore-Smith was deliberately indifferent to any serious medical need. (Def. Br. at 18-24). This court agrees with defendants. Plaintiff's reported injuries do not rise to the level of a serious medical need. Even if his injuries did rise to that level, plaintiff has not stated a claim for deliberate indifference by defendant Lattimore-Smith.

### 1.    Objective Element

Plaintiff claims that he suffered a swollen eye, abrasions and cuts to his fingers, a possible rib fracture, chipped teeth, and migraine headaches as a result of defendants' use of force. (Sec. Am. Compl. ¶¶ 95-97, 110). These types of minor, temporary injuries have been held not to constitute serious medical needs as a matter of law. For example, in *Bradley v. Rell*, 703 F. Supp. 2d 109 (N.D.N.Y. 2010), the court held that plaintiff's allegations that he suffered a headache and blurry vision, swelling and bruising around his head, and an abrasion to his right lower leg, extreme headaches, and psychological problems, were insufficient for a rational fact finder to conclude that his injuries were sufficiently serious to constitute a serious medical need. *Id*. at 121-22

22

(collecting cases); *see also Lewis v. Havernack*, No. 12-CV-31 (GLS/DEP), 2013 WL 1294606, at *9 (N.D.N.Y. Jan 23, 2013) (Rep't- Rec.) (holding that injuries to plaintiff's upper cheeks and lower eyelid resulting from being punched are "minor injuries, which are not sufficiently serious to state a deliberate indifference claim under the Eighth Amendment") (collecting cases), *adopted*, 2013 WL 1294592 (N.D.N.Y. Mar. 28, 2013); *Sledge v. Fein*, No. 11 Civ. 7450, 2012 WL 4761582, at *5 (S.D.N.Y. Aug. 2, 2012) (noting that courts have "held that terrible and extreme headaches and swelling do not satisfy the objective component of an Eighth Amendment claim"); *Latouche v. Tompkins*, No. 09-CV-308 (NAM/RFT), 2011 WL 1103022, at *14 (N.D.N.Y. Mar. 4, 2011) (Rep't-Rec.) (finding that a 4-5 centimeter bruise, a 2-3 centimeter cut, and a scratch on plaintiff's face and pain from a bump on the right and left sides of his face are not objectively sufficiently serious to support a claim of medical indifference), *adopted*, 2011 WL 1103045 (N.D.N.Y. Mar. 23, 2011); *Dallio v. Hebert*, 678 F. Supp. 2d 35, 44-45 (N.D.N.Y. 2009) (holding that two black eyes, bruising in kidney area, kick marks and open lacerations on knees, bruising and red spots on thigh, lacerations on arms and wrists, a headache, and numbness in hands and fingers are not "conditions of urgency that may produce death, degeneration, or extreme pain") (collecting cases); *Jones v. Furman*, No. 02-CV-939F, 2007 WL 894218, at *10 (W.D.N.Y. Mar. 21, 2007) (explaining that soreness, pain in and a lump behind ear, lump on back of head, abrasions on nose and knuckle, and bruising to back, ribs and legs do not constitute a serious medical condition); *Hickey v. City of New York*, 01-CV-6506, 2004 WL 2724079, at *16 (S.D.N.Y. Nov. 29, 2004) (holding that cuts and

bruises do not constitute sufficiently serious medical needs); *Rodriguez v. Mercado*, 00-CV-8588, 2002 WL1997885, at *8 (S.D.N.Y. Aug. 28, 2002) (finding that bruises to plaintiff's head, back and wrists, accompanied by back pain and migraines but no loss of consciousness did not constitute a medical condition that was sufficiently serious for purposes of the Eighth Amendment).

### 2.    Subjective Element

Even if plaintiff's injuries were sufficiently serious to support an Eighth Amendment claim, plaintiff has failed to establish that defendant Lattimore-Smith was deliberately indifferent to his medical needs.  Defendant Lattimore-Smith examined plaintiff shortly after the January 18, 2015 use of force, and she concluded that his injuries would heal over time, and thus did not require any immediate medical intervention. (Dkt. No. 132-20, "Lattimore-Smith Decl." ¶ 9-23).  Plaintiff's belief that defendant Lattimore-Smith should have referred him to a doctor for x-rays, and provided anti-bacterial ointment, bandages, and ice packs amounts to a dispute over the appropriate treatment, and does not give rise an Eighth Amendment claim.  *Dean*, 804 F.2d at 215; *Sonds*, 151 F. Supp. 2d at 311.  Likewise, plaintiff has not demonstrated, and his medical records do not indicate, that his condition had appreciably worsened when defendant Lattimore-Smith allegedly advised other medical staff that plaintiff was "fine" the day after the use of force. (Dkt. No. 132-21, Lattimore-Smith Decl. Ex. A, at 7).

Based on the analysis above, this court recommends that defendant Lattimore-Smith be granted summary judgment with respect to plaintiff's medical indifference

24

claims, that the complaint be dismissed as against her, and that she be terminated as a defendant in this proceeding.

## VI.    Qualified Immunity (Cornell)

### A.    Legal Standards

The doctrine of qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In determining if a particular right was clearly established, the court "looks to whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful."  *K.D. ex rel Duncan v. White Plains School Dist.*, No. 11 Civ. 6756, 2013 WL 440556, at *10 (S.D.N.Y. Feb. 5, 2013) (citing *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011)).  The court must ask whether the right at issue was established "'in a particularized sense so that the contours of the right [were] clear to a reasonable official'" in light of the specific context of the case, "not as a broad general proposition."  *Id*. (citing, *inter alia, Reichle v. Howards*, 566 U.S. 658, 665 (2012)).

A case directly on point is not required, and the question is not whether an attorney would learn about the right from researching case law, but whether existing precedent has "placed the statutory or constitutional question beyond debate."  *Id*. (citing, *inter alia, Fabrikant v. French*, 691 F.3d 193, 213 (2d Cir. 2012)).  Only Supreme Court and Second Circuit precedent, existing at the time of the alleged

25

violation, are relevant in deciding whether the right is well established. *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004). Because qualified immunity is "'an immunity from suit rather than a mere defense to liability,'" the Supreme Court has "'repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009) (citations omitted).

### B. Application

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendant. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (citations omitted). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Id.* at 380. The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett*, 343 F.3d at 137.

Plaintiff contends that defendant Cornell repeatedly asked plaintiff to become a confidential informant for him, and that plaintiff had refused and warned defendant Cornell that he would file a grievance against him if he persisted in his requests. (Sec.

26

Am. Compl. ¶¶ 165-172).  In his Second Amended Complaint, plaintiff contends that in retaliation for this refusal, defendant Cornell planted a weapon in his cell and wrote a false misbehavior report against plaintiff. (*Id*. ¶ 173-178).

While this motion was pending, the Second Circuit addressed the question of whether inmates have a First Amendment right to refuse to become an informant.  In *Burns v. Martuscello*, the plaintiff alleged that he had been placed in Involuntary Protective Custody ("IPC") as retaliation for his repeated refusals to become a "snitch" for correctional officers.  *Id*., 890 F.3d 77, 89-90 (2d Cir. May 9, 2018).  The Second Circuit evaluated plaintiff's claim and concluded, for the first time, that the First Amendment protects an inmate's refusal to act as an informant for prison officials.  *Id.* at 90, 94.  The Court went on to find that false reports that resulted in plaintiff being placed into restrictive IPC for six months rose to the level of an "adverse action," and that there was a material question of fact whether those false reports were made because plaintiff had "declined to serve as a snitch."  *Id*. at 94.  Therefore, the *Burns* plaintiff had made a sufficient showing of First Amendment retaliation.  *Id.*

After reaching this conclusion, the Second Circuit noted that neither the Supreme Court nor any other circuit court had yet decided whether a prisoner holds a right not to serve as an informant, and that prior decisions did not "clearly foreshadow[] our decision today."  *Id*.  Therefore, the *Burns* defendants were entitled to qualified immunity as to plaintiff's retaliation claims "due to the novel nature of the legal questions" presented in the case.  *Id.* at 94-95.

*Burns* is instructive for this case.  Here, plaintiff has alleged that defendant

Cornell filed a false misbehavior report, charging plaintiff with possession of a weapon, in retaliation for the exercise of plaintiff's First Amendment right not to become an informant.  This allegedly false report, which resulted in disciplinary punishment, would constitute an adverse action.  *Gill*, 389 F.3d at 384 (2d Cir. 2004) (filing of false misbehavior reports that resulted in a sentence of three weeks of keeplock confinement constituted an adverse action).  Plaintiff has also raised a material question of fact regarding causation, by filing correspondence with his response to this motion showing that the Cayuga County District Attorney's office had "credible evidence that Officer Cornell placed a contraband weapon on another inmate at Auburn Correctional Facility in April 2015." (Dkt. No. 138-5, at 48).  Plaintiff also filed a related press release from Cayuga County District Attorney Jon Budelmann, stating that "a Correction Officer from Auburn Prison admitted that he 'put a weapon on an inmate' in order to break up a prison gang." (*Id*. at 51).  The Cayuga County District Attorney's office had previously voluntarily filed similar material with this court in November 2017, in response to plaintiff's motion for issuance of a subpoena in this matter.[1] (Dkt. Nos. 124-128).

As in *Burns,* plaintiff has made a sufficient showing of First Amendment retaliation, arising from his refusal to become an informant for defendant Cornell.  However, just as in *Burns*, plaintiff's First Amendment right "not to snitch" was not sufficiently clear at the time of the alleged retaliation in January 2015.  Therefore, defendant Cornell is entitled to qualified immunity as to this claim.

---

[1] In light of this voluntary disclosure, this court denied plaintiff's motion for issuance of a subpoena as moot on November 27, 2017. (Dkt. No. 128).

Likewise, it has not yet been clearly established that plaintiff's alleged warning to defendant Cornell that he would file a grievance is speech protected by the First Amendment. *See Gibson v. Fischer*, No. 9:10-CV-968 (LEK/TWD), 2014 WL 7178346, at *18 (N.D.N.Y. December 15, 2014) ("The question of whether a threat to file a grievance or retain counsel is protected by the First Amendment does not appear to have been squarely addressed by either the Supreme Court or the Second Circuit."); *see also Faircloth v. Schwartz*, 673 F. App'x 791, 793 (10th Cir. 2016) (". . . we are aware of no Supreme Court or Tenth Circuit opinion declaring that a threat to file a grievance is constitutionally protected activity. And there is certainly no consensus of other courts.")

Therefore, based upon a review of relevant caselaw, this court finds that the First Amendment rights asserted by plaintiff were not clearly established when defendant Cornell allegedly retaliated against plaintiff in January 2015. Accordingly, this court recommends that defendant Cornell be granted summary judgment on plaintiff's retaliation claim on qualified immunity grounds.

## VII.  Due Process (Lamanna, Robinson, Venettozzi)

### A.  Legal Standards

To begin a due process analysis relating to prison disciplinary proceedings, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Supreme

Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

The due process protections afforded inmates facing disciplinary hearings that are found to affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (*citing*, *inter alia, Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)).  The hearing officer's findings must be supported by "some" "reliable evidence." *Id*. (*citing, inter alia, Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

### B.    Application

In this case, it is undisputed that plaintiff had a liberty interest protected by the due process clause.  The issue is whether plaintiff received the requisite procedural due process protections at his disciplinary hearing.  Defendant Lamanna was the hearing officer at his disciplinary hearing.  Plaintiff has raised two challenges to his handling of the hearing. (Sec. Am. Compl. ¶¶ 179-253)  First, he alleges that defendant Lamanna denied him witness testimony and documentary evidence that were crucial to his defense.  Next, he alleges that defendant Lamanna's leading and inappropriate

30

questions to defendant Kirkwood demonstrated bias against plaintiff.  Plaintiff has not

alleged any deficiencies in the notice or assistance that he received prior to trial, or that

he failed to receive a written disposition of the charges.

### 1.    Denial of Witnesses and Documentary Evidence

### a.    Reverend Harris

An inmate's right to call witnesses is not absolute.  *Eleby v. Selsky*, 682 F. Supp.

2d at 291 (citing inter alia *Ponte v. Real*, 471 U.S. 491, 495 (1985)).  Prison officials

have the authority to refuse to call witnesses whose testimony the official "reasonably

regards as duplicative or non-probative," while at the same time, may be required to

explain, in a limited manner, why the witness was not called." *Id.* at 291-92 (citing

*Russell v. Selsky*, 35 F.3d 55, 55-59 (2d Cir. 1994); *Ponte*, 471 U.S. at 497).  They are

not required to give a detailed explanation, and may do so by "'making the explanation

part of the administrative record at the disciplinary proceeding.'" *Id.* at 292 (quoting

*Ponte*, 471 U.S. at 497).

Reverend Harris was conducting the religious service when plaintiff was

removed from the Auburn chapel on January 18, 2015. (Dep. at 195).  During his

disciplinary hearing, plaintiff testified that he could hear Reverend Harris speaking into

a chapel microphone at the same time that plaintiff was screaming for help after he was

taken to the ground. (Dkt. No. 132-12, "Hearing Transcript" at 17).  Before adjourning

the hearing on the first day, defendant Lamanna stated, "I'll talk to the Reverend, see if

she actually heard or saw anything." (*Id.*)

Reverend Harris was not mentioned again during the disciplinary hearing, and it

is unclear if defendant Lamanna ever spoke to her.  In his declaration in support of this motion, defendant Lamanna stated, "Upon information and belief, Reverend Harris did not witness any physical altercation between staff and plaintiff on January 18, 2015, and thus, could not provide any relevant testimony." (Dkt. No. 132-10, "Lamanna Decl." ¶ 37).  It is unclear how defendant Lamanna reached that conclusion.

Plaintiff contends that defendant Lamanna improperly refused plaintiff's request for Reverend Harris's testimony, and failed to provide a proper justification for doing so. (Sec. Am. Compl. ¶¶ 204-208).  However, plaintiff has not demonstrated that he ever actually requested Reverend Harris's testimony.  Prior to the hearing, plaintiff only requested one witness, an inmate named A. Baker. (Dkt. No. 138-5, at 73).  During the hearing, plaintiff repeatedly confirmed that Baker was the only witness that he intended to call. (Hearing Transcript at 27, 42).

Plaintiff has contended that the hearing transcript was edited to delete his request for Reverend Harris's testimony. (Dkt. No. 137).  To support that claim, plaintiff has provided what he deems an accurate copy of the audio recording of that disciplinary hearing to defendants' counsel, and defendants' counsel has filed that recording with the court. (Dkt. No. 147, 151).  This court has reviewed the full recording, and agrees with plaintiff that the hearing transcript contains errors and omissions.  However, although the transcript does not include the full discussion regarding Reverend Harris, the audio does not show that plaintiff ever requested Reverend Harris's testimony.  The excerpts below are based upon the court's review of the audio recording provided by plaintiff.  Where appropriate, omissions or errors in the hearing transcript (Dkt. No.

132-12) have been noted.

Plaintiff first mentioned Reverend Harris when he was describing the initial use of force by defendants O'Hara and Kirkwood:

> Plaintiff:    So I'm on the ground, and Officer Kirkwood, he like comes over, and he puts his knee on my head and he is pulling my hair out, he's pulling my hair out. I had these same braids on my head. He grabs a handful of my hair, pulls, I start screaming. At this point in time, Reverend Harris, she got on the microphone, because like it was services. She got on the microphone, I'm screaming, I'm screaming for help and everything, Reverend Harris gets on the microphone, she says this is, she's like yo, she's like this is Reverend Harris. She said something, but I couldn't make it out what she said. Um, at this time, like I said, you know, O'Hara, not O'Hara . . .

> Lamanna:    You were out in the hallway, right?

> Plaintiff:    Um yeah . . . right in front of the two doors . . .

> Lamanna:    OK. So she couldn't see anything from where she was at?

> Plaintiff:    Right, right. Um . . .

> Lamanna:    But she, but she heard something?

> Plaintiff:    Yes, I was screaming, like I was screaming for help or whatever. Um, ok. I'm on the ground, O'Hara, um Kirkwood is pulling my hair. He's got like two hand-fists full of my hair, he's pulling my hair out. I'm screaming, and trying to get away . . . .

(Dkt. No. 151, CD 1, Track 8, at 0:33). Reverend Harris was later mentioned by defendant Lamanna at the close of the first day of the hearing:

| Lamanna: | You got one inmate witness, **no other witnesses**, right?[2] |
|---|---|
| Plaintiff: | No. |
| Lamanna: | I'm going to see, I'll talk to the Reverend, see if she actually heard or saw anything.  If she did we'll have her come testify. |
| Plaintiff: | OK. |

(Dkt No. 151, CD 1, Track No. 12, at 1:27).

Those are the only two references to Reverend Harris on the recording.  Thus, it is clear that plaintiff never made an affirmative request that Reverend Harris testify at his disciplinary hearing.  Plaintiff also repeatedly confirmed that inmate Baker was the only witness that he intended to call. (Dkt. No. 132-12, at 27[3], 42[4]).  Moreover, plaintiff did not raise any objection to the lack of Reverend Harris's testimony during the hearing.

This court has found no support for the argument that a hearing officer's failure to obtain the testimony of an unrequested witness rises to the level of a due process violation.  However, to the extent that defendant Lamanna's error could be found to

---

[2] There is an error in the hearing transcript provided with defendant Lamanna's declaration.  The transcript incorrectly reads, "You've got one inmate witness, 2 other witnesses, right?" (Dkt. No. 132-12, at 17).

[3] On the audio recording, plaintiff tells defendant Lamanna, "I don't have any other witnesses." (Dkt. No. 151, CD 1, Track No. 20, at 0:54).

[4] On the audio recording, defendant Lamanna asked plaintiff, "Alright, what other witnesses do you have for me?" Plaintiff responded, "Besides Baker, I have- I have no other witnesses." (Dkt. No. 151, CD 2, Track No. 1, at 1:53).

have violated plaintiff's constitutional rights,[5] any such violation would have been harmless. The Second Circuit has held that prison disciplinary hearings are subject to a harmless error analysis. *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial. If a person may be convicted and obliged to serve a substantial prison sentence notwithstanding a constitutional error determined to be harmless . . . surely the conditions of confinement of a sentenced prisoner may be made temporarily more severe as discipline for prison rules infraction despite a harmless error in adjudicating the violation.") To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing. *See, e.g., Clark v. Dannheim*, 590 F. Supp. 2d 426, 429 (W.D.N.Y. 2008) (citing, *inter alia*, *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir.1991).

In his Second Amended Complaint, plaintiff speculates that Reverend Harris "may have seen or heard" the altercation on January 18, 2015. (Sec. Am. Compl. ¶ 204-207). However, during the hearing, plaintiff only suggested that Reverend Harris had heard his screams for help after he was pulled down to the floor. (Dkt. No. 151, CD 1, Track 8, at 0:33). The defendants' use of force was not at issue during the disciplinary

---

[5] Again, this court makes no such finding. The court is only assuming such a violation for purposes of the harmless error analysis.

hearing.  Rather, the disciplinary hearing focused on the charge that plaintiff had assaulted defendants O'Hara and Kirkwood *prior* to the correctional officers' use of force. (Dkt. No. 132-11, at 8, 9).  At his disciplinary hearing, plaintiff did not allege that Reverend Harris could offer any testimony regarding plaintiff's actions prior to the defendants' use of force.

Plaintiff also did not allege during the disciplinary hearing that Reverend Harris could substantiate the cause of defendant O'Hara's injury.  Specifically, plaintiff did not allege during the hearing that Reverend Harris could hear defendant O'Hara whisper to defendant Kirkwood to punch him, or that she had observed defendant Kirkwood's alleged punch.  Because Reverend Harris's potential testimony, as described by plaintiff at the hearing, was not relevant to the charges being considered by defendant Lamanna, any error in excluding Reverend Harris's testimony was harmless.[6]

### b.    Documentary Evidence

Plaintiff contends that defendant Lamanna failed to provide plaintiff with photographs of defendant O'Hara and defendant Kirkwood's injuries and any associated injury reports.  He also contends that defendant Lamanna should have provided him full copies of the Unusual Incident ("UI") report that was considered at the hearing.

A significant portion of the hearing was dedicated to plaintiff's allegation that

---

[6] This conclusion regarding plaintiff's disciplinary hearing does not preclude Reverend Harris' testimony if plaintiff's excessive force claims proceed to trial.

defendant O'Hara falsely blamed plaintiff for his injuries by having defendant Kirkwood punch him in the face. (Hearing Transcript at 13-16, 34, 42-44). However, there is nothing in the record to support plaintiff's contention that he requested photographs of the correctional officers that depicted their alleged injuries. During the hearing, defendant Lamanna read the injury reports for defendants O'Hara and Kirkwood into the record. (Hearing Transcript at 24). Plaintiff did not request any photographs at that time. Later in the hearing, defendant Lamanna stated that he was looking for photographs of the sharpened can top allegedly found by defendant Cornell. Plaintiff clarified, "No. I'm requesting pictures of me . . ."[7] (Hearing Transcript at 26). Therefore, plaintiff's due process rights were not violated by the failure to receive or view the unrequested photographs showing the injuries to defendants O'Hara and Kirkwood.

Prior to the hearing, plaintiff's hearing assistant read him the contents of the preliminary UI report. (Dkt. No. 132-11, at 11). At the hearing, defendant Lamanna read the UI report into the record. (Dkt. No. 132-12, at 24-26). Plaintiff requested a copy of the report, but defendant Lamanna refused, stating that the report was not final yet. (Dkt. No. 151, CD 1, Track 18, at 0:57). Plaintiff consented to having the report

---

[7] The audio recording of the hearing likewise demonstrates that plaintiff only requested photographs of his own injuries. After defendant Lamanna offered to locate a photograph of the can top weapon, plaintiff responded, "No, I've already seen the weapon. I'm requesting to see uh, you know um, the pictures of me um, you know the escort um . . ." (Dkt. No. 151, CD 1, Track 19, at 0:59). Even if plaintiff's request could be interpreted as seeking photographs of the correctional officers who escorted him to SHU, plaintiff has stated that defendants O'Hara and Kirkwood were not part of that escort. (Dep. at 114).

read in to the record instead.[8] (Dkt. No. 151, CD 1, Track 18, at 1:11).

The record shows that plaintiff was provided access to the contents of the UI report prior to and during the hearing. Defendant Lamanna also explained why he refused to provide plaintiff a copy of the UI report. Therefore, plaintiff was afforded adequate due process, despite being denied a copy of the UI report.

### 2.    Impartial Hearing Officer

Due process requires that prison disciplinary hearings be conducted by a hearing officer who is fair and impartial. *Shabazz v. Bezio*, 669 F. App'x 592, 593 (2d Cir. 2016) (citing *Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999). However, because of the "special characteristics" of the prison environment, the degree of impartiality required of prison officials does not rise to the level of that required of judges generally. *Id.* (citing *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996). A plaintiff's claim that the hearing officer was not impartial requires more than just the inmate's "subjective belief" to this effect. *Brooks v. Prack*, 77 F. Supp. 3d 301, 316 (W.D.N.Y. 2014) (citing *Frances v. Coughlin*, 891 F.2d 43, 47 (2d Cir. 1989)). In this context, due process requires that the hearing officer's findings be supported by "some 'reliable evidence of the inmate's guilt.'" *Id.* (quoting *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004)).

As the hearing officer, defendant Lamanna was responsible for maintaining an

---

[8] On the audio recording, plaintiff asked defendant Lamanna, "Am I able to get a copy of that [UI report]?" Defendant Lamanna replied, "Not yet. It's still preliminary. It's not final. So, the only thing I can do is I can read it in, is that what you want me to do?" Plaintiff responded, "Yeah, sure." (Dkt. No. 151, CD 1, Track 18, at 1:05).

orderly hearing and to determine the facts.  *See e.g. Kinsley*, 937 F.2d at 30 (prison

officials must be accorded the discretion necessary to keep a hearing within reasonable

limits).  Prison officials enjoy a "'rebuttable presumption that they are unbiased.'"

*Jabot v. Correction Officer Minor*, No. 9:13-CV-5322113, at *11 (N.D.N.Y. July 15,

2016), (*Rep't Rec.*) *adopted*, 2016 WL 5173279 (N.D.N.Y. Sept. 21, 2016), *appeal*

*dismissed*, No. 16-3321 (2d Cir. Sept. 27, 2016).  In this case, plaintiff contends that

defendant Lamanna demonstrated his bias through leading questions during defendant

Kirkwood's testimony:

> Plaintiff:     . . . Ah, do you recall who allegedly took me to the floor?
>
> Lamanna:   I think they both did, according to the report . . . Did you guys both take him to the floor? . . .You were both on the Use of Force, you and O'Hara?
>
> Kirkwood:  Well, yeah.
>
> Lamanna:   You and O'Hara?
>
> Kirkwood:  Yeah, me and O'Hara.

(Dkt. No. 132-12, at 31).  A hearing officer's use of leading questions, without more,

does not mean that he was impermissibly guiding a witness's answer or engaging in

inappropriate or biased conduct.  *See Logan v. Harvey*, No. 9:16-CV-1412 (FJS/CFH),

2017 WL 9511179, at *7 (N.D.N.Y. Sept. 26, 2017) (Rep't-Rec), *adopted*, 2017 WL

4621108 (N.D.N.Y. Oct. 16, 2017).  Plaintiff has provided no support for his subjective

belief that defendant Lamanna's leading questions were intended to improperly guide

defendant Kirkwood's testimony.

In addition, a hearing officer may satisfy the standard of impartiality if there is "some" evidence in the record supporting the findings of the hearing. *Allred v. Knowles*, No. 06-CV-456, 2010 WL 3911414, at *5 (W.D.N.Y. Oct. 5, 2010) (quoting *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)). Here, defendant Lamanna relied on the multiple misbehavior reports in the case, and the testimony of defendants O'Hara and Kirkwood in reaching his determination. While plaintiff's testimony contradicted the evidence relied upon by defendant Lamanna, this court cannot reweigh the evidence before the hearing officer. *See Kotler v. Daby*, No. 9:10-CV-136, 2013 WL 1294282, at *10 (N.D.N.Y. Mar. 28, 2013) (even when plaintiff provides a very different version of the incident in question, the hearing officer is entitled to make credibility determinations in rendering his decision, and plaintiff's own testimony to the contrary does not render the disposition unsupported by some evidence) (citations omitted). The relevant inquiry is not whether the hearing officer's decision was "correct," but whether the decision met the requisite evidentiary standard required by the law. *Hernandez v. Selsky*, 572 F. Supp. 2d 446, 452 (S.D.N.Y. 2000).

Based upon this court's review of the record, it is evident that plaintiff was provided advance notice of the charges against him, an opportunity to call witnesses and introduce evidence, and a written statement explaining the hearing officer's determination. Plaintiff has failed to demonstrate that his due process rights were violated by the exclusion of Reverend Harris's testimony, by the refusal to provide him a copy of the UI report, or by defendant Lamanna's leading questions. Therefore, the disciplinary hearing conducted by defendant Lamanna afforded plaintiff

constitutionally sufficient due process.  Because the disciplinary hearing did not violate plaintiff's due process rights, the administrative review by defendants Robinson and Venettozzi was constitutionally sufficient as well.  Accordingly, this court recommends that defendants' summary judgment motion be granted with respect to all claims against defendants Lamanna, Robinson, and Venettozzi.

WHEREFORE, based on the findings above, it is

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 132) be GRANTED with respect to all claims against defendants Lattimore-Smith[9], Cornell, Lamanna, Robinson, and Venettozzi, and it is further

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 132) be DENIED with respect to all claims against defendants O'Hara, Kirkwood, Curtis, Seery, Dilallo, and Walshvelo.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

---

[9] Defendant Lattimore-Smith is listed as "E. Smith" on the docket.

41

636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.


Dated:     July 24, 2018

Hon. Andrew T. Baxter
U.S. Magistrate Judge